**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

| | |
|---|---|
| **INTEGRITY COAL SALES, INC.** **Plaintiff,** v. **ALGOMA STEEL INC.,** **Defendant.** | Civil Action No. 5:25-cv-00602 |

**COMPLAINT**

Plaintiff Integrity Coal Sales, Inc. ("Integrity") brings this action against Defendant Algoma Steel Inc. ("Algoma") and alleges as follows:

**INTRODUCTION**

1. On October 18, 2021, Integrity and Algoma entered into a contract for the purchase by Algoma of coal from Integrity. The contract calls for the coal, sourced by Integrity in substantial part from mines in West Virginia, to be shipped by rail to ports in Ohio for ultimate delivery by lake vessel to Algoma's facility in Ontario, Canada.

2. The contract has been amended seven times. The most recent amendment, dated April 7, 2025, was negotiated and signed *after* President Trump had already imposed a 25% tariff on steel imported from Canada and amid public reports that the President was likely to increase significantly the amount of that tariff.

3. On October 2, 2025, Algoma announced to Integrity its intention to repudiate the contract and to refuse to accept any further deliveries of coal thereunder. On October 7, 2025, Algoma carried through on that intention by cancelling two shipments of coal that had already been scheduled with the railroad for delivery to Algoma in mid-October.

1

4. Algoma claims that its repudiation of the contract is justified because the current tariffs on Canadian steel constitute "unforeseeable, supervening governmental action" that has "destroyed" a fundamental assumption of the contract. Algoma says that these tariffs and their impact on its access to the U.S. market were "unforeseeable at the tim[e] the parties entered into our Agreement" and have "permanently" altered the "underlying commercial purpose of the Agreement."

5. Algoma's claims are demonstrably false. Algoma entered into the most recent amendment to the contract with its eyes wide open and with a full appreciation of the tariff risk it now says was "unforeseeable." In truth, Algoma seeks to avoid its obligations under the contract in pursuit of its announced strategy of "transforming the way we make steel to Electric Arc Furnace Steelmaking" and to thereby "minimize [the] need for coal" in its manufacturing process. Tariff concerns are a pretext and provide no basis for terminating or suspending the Parties' contract.

6. Integrity brings this suit to obtain a declaration that Algoma's pretextual repudiation of the contract cannot stand, to enforce the Parties' agreement, and to obtain damages for the significant harm that Algoma's unlawful actions have already caused and will cause in the future.

## PARTIES

7. Integrity is a corporation organized and existing under the laws of New York. Integrity's principal place of business is in Ronkonkoma, New York.

8. Integrity was founded in 1990. Over the past 35 years, Integrity has grown to become one of the premium suppliers of high-quality U.S. coal to the global marketplace. Integrity is a shipper of high-grade metallurgical, thermal, and anthracite coal. Integrity has a

field manager stationed in West Virginia and sources a substantial amount of the coal it supplies to its customers from mines in West Virginia, including mines located in McDowell, Wyoming and Logan counties.

9. Algoma is a Canadian corporation organized and existing under the laws of British Columbia, Canada. Its principal place of business is in Ontario, Canada. Algoma is a fully integrated producer of hot and cold rolled steel products including sheet and plate. According to its public statements, "Algoma is on a transformation journey, modernizing its plate mill and adopting electronic arc technology that builds on the strong principles of recycling and environmental stewardship to significantly lower carbon emissions." Algoma has established minimum contacts with West Virginia of jurisdictional significance by, among other things, contracting to purchase coal from Integrity knowing that much of that coal would be sourced in West Virginia and knowingly inducing Integrity to enter into contracts with West Virginia mines and with railroads to transport coal from West Virginia. Over the course of its relationship with Integrity, Algoma has made multiple visits to West Virgina in connection with coal purchases.

## JURISDICTION AND VENUE

10. This Court has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

11. This Court has personal jurisdiction over Algoma and venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred here and a substantial part of property that is the subject of the action is situated here. The Parties' contract has a clause authorizing, but not requiring, that disputes be litigated in Ontario, Canada. There is no exclusive forum provision that would preclude maintenance of this suit in this Court.

## BACKGROUND

12.     On October 18, 2021, Integrity and Algoma entered into a Coal Purchase and Sale Agreement (the "Contract").

13.     The Contract obligates Integrity to sell, and Algoma to purchase, coal sourced by Integrity from three mines in West Virginia (McDowell, Wyoming and Logan) and one in Kentucky.

14.     As originally executed, the Contract called for deliveries of a stated volume of coal during the period from April 1, 2022, to December 31, 2022.

15.     Seven subsequent amendments address deliveries in the years after 2022.

16.     The most recent amendment (Amendment #7) is dated April 7, 2025.  It obligates Algoma to purchase 183,700 tons of coal from Integrity to be delivered between September 2025 and April 2026.

17.     To meet its obligations, Integrity entered into purchase orders with mines in West Virginia and Kentucky to acquire the coal that Integrity is obligated to deliver to Algoma under Amendment # 7.  Algoma was aware that Integrity was sourcing coal from West Virginia to supply to Algoma under the Contract as amended.

**A.     Algoma Negotiates Amendment #7 in the Midst of a Brewing Trade War**

18.     By the time Algoma and Integrity began negotiating Amendment # 7, President Trump had already imposed a 25% tariff on Canadia steel under Section 232 of the Trade Expansion Act.  Moreover, as the Parties were negotiating and preparing to perform Amendment # 7, the risk that the United States might significantly increase this 25% tariff on Canadian steel was well known.   Indeed, after announcing the 25% tariff in February 2025, President Trump and his advisors made repeated public announcements that a substantial increase was in the

offing, and those announcements received widespread media coverage. The June 2025 increase in the tariff from 25% to 50% thus came as no surprise.

19. Algoma cannot credibly claim otherwise. For many years, Algoma has acknowledged in its SEC filings and elsewhere the risk that "trade barriers including tariffs and/or trade wars" could have a material adverse impact on its business. By March 12, 2025, a month before the effective date of Amendment # 7, Algoma disclosed in an SEC filing a specific risk to its business from "recent trade tensions and proposed tariffs." In that filing, Algoma reported that "tariffs and other trade barriers may restrict our ability to compete internationally" and provided a detailed report on the very risk that it now claims was "unforeseeable":

> We have a significant number of customers located in the United States. For the nine month period ended December 31, 2024, 62% of our revenue was from customers located in the United States. ***We expect that our ability to sell to U.S. customers and compete with producers located in the United States will be materially and adversely impacted by tariffs and/or trade restrictions imposed on our products, such as those discussed below should they remain in place, as our products will be less competitive compared to those sourced domestically in the United States***. In addition, we are exposed to the risk that the government support we receive may be perceived as a subsidy by international trade bodies or foreign governments, potentially leading to trade actions or retaliatory measures.
>
> In particular, the Company is subject to the risks associated with U.S Tariffs on the imports of Canadian products into the United States. On February 1, 2025, President Trump issued three Executive Orders implementing tariff actions pursuant to the International Emergency Economic Powers Act against imported products of Canada (25% on all products except energy products at 10%), Mexico (25%) and China (10%), beginning March 4, 2025. On March 6, 2025, President Trump announced a delay for tariffs on USMCA-compliant goods for Canada and Mexico until April 2, 2025. President Trump also directed the U.S. Trade Representative ("USTR") to review the new USMCA, and the United States has launched analyses of additional sectoral tariffs (e.g., steel, aluminum, semiconductors, copper, oil & gas, and pharmaceuticals). On March 12, 2025, President Trump by Executive Order imposed 25% ad valorem tariffs for steel articles,

5

> aluminum articles, and steel and aluminum derivatives (i.e., "downstream" articles), without / exclusions, pursuant to Section 232 of the Trade Expansion Act of 1962, and ***President Trump has stated that he may increase such tariffs in excess of 25% and that any other imposed or threatened tariffs could also increase. The tariffs are expected to have a material and adverse impact on the Company's financial position, results of operations and liquidity***; however, an estimate of the financial impact cannot be made at this time.
>
> The ongoing threat of tariffs has contributed to volatility in steel demand and pricing in both the U.S. and Canadian markets, with concerns over supply/ chain disruptions leading to fluctuations in purchasing patterns. Additionally, the uncertainty surrounding trade policies has affected the U.S. dollar exchange rate, which in turn impacts our sales and cost structure by influencing raw material costs, pricing competitiveness, and cross-border trade dynamics. To the extent such U.S. tariffs have and may continue to lead to retaliatory tariffs on imports of United States products into Canada, or otherwise causes an increase in the prices of the inputs the Company uses in its operations or diminished availability in Canada of such inputs the Company's ability to maintain its current cost structure or level of operations may be materially and adversely affected. ***In addition, general or specific tariffs having an adverse effect on substantial consumers of steel products, such as the automotive industry, may significantly reduce the demand for our products. Any of these risks may result in, among other things, the Company experiencing reduced production levels, higher costs and lower operating margins, any of which could have a material and adverse effect on our financial position, results of operations and liquidity.*** If these or any other of the risks contemplated by this Annual Information Form manifest themselves in a manner that has a disproportionate effect on the Company's operations the Company's financial condition and results of operations may be materially and adversely affected.

*See* Form 40-F, Annual Report Pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, filed by Algoma Steel Group Inc. on March 12, 2025 (emphasis added).

20. As this disclosure plainly shows, the risk of high tariffs that could curtail access to Algoma's principal market and thereby due it significant financial harm, was well known to Algoma and was assumed by Algoma. That Algoma would suffer negative impacts from

6

existing and threatened tariffs was a basic assumption on which the Amendment #7 to the Contract was made.

**B.     Algoma Initially Indicates an Intent to Perform Notwithstanding the Trade War**

21.     Notwithstanding its tariff concerns, Algoma initially acted as if it intended to perform its obligations under Amendment #7, thereby inducing Integrity to continue its preparations to perform.  For example, and even though 50% tariffs on Canadia steel were in full force and effect, Algoma initiated the process on September 24, 2025, of scheduling with the CSX railroad the availability of two trainloads of coal to deliver 24 tons of coal that Algoma was obligated to purchase under Amendment #7.

22.     Then, on September 29, 2025, Algoma publicly announced that it had obtained $500 million in liquidity support in the form of a $400 million loan from the Government of Canada and a $100 million loan from the Province of Ontario.  These loans were made under programs specifically designed to help businesses like Algoma navigate the "prolonged trade uncertainty" caused by Section 232 tariffs on Canadian steel.

23.     Algoma told its investors and the industry in its press release that these loans would allow Algoma to "withstand" the impact of Section 232 tariffs, thereby suggesting that Algoma would continue to honor its commitments to suppliers like Integrity.   The message to Integrity and other Algoma counter-parties as of September 29 was clear: (a) Algoma can and will continue to honor its commitments notwithstanding high tariffs and (b) the tariffs (in light of Algoma's increased liquidity) have not rendered it commercially impracticable for Algoma to perform its contracts.

**C.     Algoma's Belatedly Invokes the Trade War as a Pretext to Terminate**

24.     Three days later, Algoma abruptly changed course.  On October 2, 2025, Algoma

sent to Integrity a "Notice of Frustration of Contract" that reads:

> Algoma Steel Inc. ("Algoma") writes regarding the COAL PURCHASE AND SALE AGREEMENT (the "Agreement") with Integrity Coal Sales, Inc..
>
> The Canadian steel industry has been fundamentally altered by the imposition of 50% tariffs on Canadian steel imports into the United States under Section 232 of the U.S. Trade Expansion Act of 1962. This U.S. government restraint, which was unforeseeable at the timing that the parties entered into our Agreement, has permanently curtailed Canadian access to the U.S. steel market, historically Algoma's principal market. As a result, the underlying commercial purpose of the Agreement has been destroyed, and its performance has become commercially impracticable and frustrated at law.
>
> This unforeseeable, supervening governmental action has rendered the continued operation of Algoma's integrated steelmaking facilities commercially and technically unviable. The Agreement was entered into on the common assumption that Algoma would operate with continued access to its U.S. market and maintain primary steelmaking operations. That assumption has now been destroyed.
>
> As a matter of law, the Agreement has been rendered commercially impracticable, frustrated, or otherwise discharged at law by reason of the unforeseeable, supervening events described above. These circumstances have discharged both parties from further performance, effective immediately. Algoma hereby provides formal notice of such frustration and impracticability, and expressly reserves all rights and defenses, including to seek declaratory relief or other remedies, in connection with this matter.

25.     On October 7, 2025, Algoma followed through on the threat contained in its Notice of Frustration by unilaterally cancelling the permit for the two trainloads of coal that, on September 24, Algoma has scheduled to transport coal to Algoma.

26.     Through these statements and actions, Algoma has unequivocally and materially repudiated and breached the Contract: it has refused to accept shipments of coal; it has declared that it will not accept (and presumably will not pay) for any further shipments of coal; and it has announced that it may seek judicial intervention to validate its unilateral and improper

8

cancellation of the Contract.

27. Algoma has done so without any factual or legal basis and premised on two demonstrably false claims: (1) the false assertion that economic consequences of Section 232 tariffs were unforeseen and (2) the false assertion that those consequences render it impracticable for Algoma to perform under the Contract. Neither claim has any validity.

### D. Integrity Suffers Substantial Harm

28. As noted, Integrity has already entered into purchase orders with mines, including mines in West Virginia, to procure the coal that Algoma is contractually bound to purchase from Integrity under Amendment #7. The cost to Integrity to acquire and transport that coal is well in excess of $31 million. If Algoma does not take the volumes of coal covered by Amendment #7, Integrity may be unable, under current market conditions, to find a substitute buyer. If Integrity can find a substitute buyer, the price will undoubtedly be well below that set forth in the Contact. In either scenario (no substitute buyer or a substitute buyer at prices below the Contract price), the result will be millions of dollars of losses to Integrity.

29. Integrity, moreover, has made commitments to railroads in order to secure the rail cars necessary to transport the coal covered by Amendment #7 to ports in Ohio. If that transportation does not occur because of Algoma's anticipatory repudiation and breach of the Contact, Integrity will incur substantial liquidated damages and other costs.

30. Integrity, moreover, is at substantial risk of having no adequate remedy at law since, on information and belief, Algoma has purported to terminate contracts with many other counter-parties and may be facing exposure to massive damage claims that it may be unable to satisfy.

## COUNT I
### DECLARATORY JUDGMENT (28 U.S.C. § 2201)
**(Declaratory relief that Integrity's claims need not be resolved by arbitration)**

31. Integrity incorporates by reference the allegations in paragraphs 1-30 as if fully restated herein.

32. The Contract has a dispute-resolution clause that requires, in some circumstances, that disputes be submitted to binding arbitration under the arbitration rules of the Society of Maritime Arbitrators.

33. The requirement to arbitrate, however, "shall not apply in the case of an anticipatory repudiation and the rights of the non-repudiating Party under applicable law shall be unaffected by said provisions [otherwise requiring arbitration]."

34. The Contract also exempts from binding arbitration any claim for specific performance.

35. Since Integrity in this case seeks relief on account of anticipatory repudiation and also seeks specific performance, Integrity's claims are not subject to binding arbitration. The Court should so declare.

## COUNT II
### DECLARATORY JUDGMENT (28 U.S.C. § 2201)
**(Declaratory relief that the Contract is binding and enforceable)**

36. Integrity incorporates by reference the allegations in the paragraphs 1-35 as if fully restated herein.

37. Despite Algoma's assertion that the Contract is no longer binding or enforceable, the Contract remains in full effect, as do the Parties' rights and obligations under the Contract.

38. The Contract has an express force majeure provision but that provision clearly excludes from its scope Algoma's "in ability economically to use . . . the product to be purchased

hereunder." Thus, there is no express contractual basis to support Algoma's Notice of Frustration.

39. There is, moreover, no basis in law for the Notice of Frustration. The tariff risk cited by Algoma was known to and accepted by Algoma when Amendment #7 was signed. Algoma's ability to perform has not been negatively impacted by any unforeseen circumstances. Algoma's performance is not commercially impracticable. There has been no failure of presupposed conditions. And, Algoma is estopped from asserting frustration given its unreasonable delay in asserting its alleged right to terminate or suspend performance.

40. An actual, substantial, immediate, and justiciable controversy exists between Integrity and Algoma with respect to whether the Contract remains binding and enforceable.

41. Declaratory relief will resolve some or all of the Parties' disputes by providing certainty with respect to the Parties' rights and responsibilities under the Contract. The Court should declare that the Contract remains in full force according to its terms and that the Notice of Frustration is a nullity.

## COUNT III
## SPECIFIC PERFORMANCE

42. The Contract expressly contemplates the availability of specific performance as a remedy upon anticipatory repudiation.

43. The Contract is a valid, enforceable agreement between the Parties.

44. Integrity is willing, ready, and able to perform all of its obligation under the Contract

45. Algoma has clearly anticipatorily repudiated the Contract.

46. The anticipatory repudiation is wrongful, given that (a) the economic consequences claimed by Algoma are expressly excluded as events of force majeure under the

contract; (b) tariff risk as a matter of law cannot give rise to frustration-based termination of a contract; (c) the tariff risk cited by Algoma was known to and accepted by Algoma when Amendment #7 was signed; and (d) there have been no unforeseen circumstances that could ever give rise to a termination right in favor of Algoma.

47. Integrity may not have an adequate remedy at law and therefore invokes its contractual right to seek specific performance. Integrity seeks an order requiring Algoma to perform all obligations under the Contract.

## COUNT IV
## DAMAGES FOR REPUDIATION AND BREACH OF CONTRACT

48. Integrity incorporates by reference the allegations in paragraphs 1-47 as if fully restated herein.

49. The Contract is a valid, enforceable agreement between the Parties.

50. Integrity has to date performed all of its obligations under the Contract.

51. Algoma has materially breached and repudiated the Contract.

52. As a proximate result, Integrity has suffered substantial actual damages for which it now sues.

## PRAYER FOR RELIEF

A. Integrity prays that the Court declare that the claims asserted herein are not subject to arbitration.

B. Integrity prays that the Court declare that the Contract (and all of its provisions) remain binding and enforceable and that Notice of Frustration is a nullity.

C. Integrity prays that the Court order specific performance.

D. Integrity prays that the Court award Integrity actual damages.

E. Integrity prays that the Court award Integrity its costs and attorneys' fees related

to this dispute.

  F. Integrity prays that the Court award Integrity such other relief as the Court deems just and proper.

  **INTEGRITY COAL SALES, INC. DEMANDS A JURY ON ALL TRIABLE ISSUES.**

DATED: October 10, 2025       Respectfully submitted,

                INTEGRITY COAL SALES, INC.

                By Counsel

/s/ Patrick C. Timony
Patrick C. Timony (WVSB #11717)
Bowles Rice LLP
600 Quarrier Street
Post Office Box 1386
Charleston, West Virginia 25325-1386
(304) 347-1100
Fax: (304) 347-1756
ptimony@bowlesrice.com

Thomas M. Farrell
Texas Bar No. 06839250
tfarrell@mcguirewoods.com
845 Texas Ave., Suite 2400
Houston, TX 77002
Telephone:(713) 353-6677
Facsimile: (832) 214-9933
(Pro Hac Vice Forthcoming)